# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | |
|---|---|
| HARRY L. CRAIG, | Case No. 5:09cv00028 |
| *Plaintiff* | REPORT AND |
| v. | RECOMMENDATION |
| MICHAEL J. ASTRUE, | By: Hon. James G. Welsh |
| Commissioner of Social Security, | U. S. Magistrate Judge |
| *Defendant* | |

The plaintiff, Harry L. Craig, brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of the Commissioner of the Social Security Administration ("the agency") denying his latest claim for supplemental security income ("SSI") under Title XVI of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§ 1381-1383f. Jurisdiction of the court is pursuant to 42 U.S.C. § 1383(c)(3), which incorporates 42 U.S.C. § 4205(g).

## I.  Administrative and Procedural History

Administratively, this case is the latest installment in the plaintiff's efforts to qualify for Supplemental Security Income. Since 1996, he has had at least six applications denied. He protectively filed his first application on August 16, 1996, and it was ultimately denied by written administrative decision dated November 1998. (R.38,66.) Claiming disability beginning on January 1, 1994, the plaintiff protectively filed a second application on October 10, 2000, but he did not

further pursue it following its denial on January 18, 2001. (R.38-39,66.) He thereafter filed a third SSI application on August 1, 2001, and as with his first application it was denied by written administrative decision dated March 28, 2003. (R.38-52.) His fourth and fifth applications were filed in March 2001 and August 2001 respectively. (R.66.) He pursued the August application through a hearing decision dated March 28, 2003. A little more than one month later the plaintiff filed a sixth application alleged disability beginning on November 10, 1999, and by written administrative decision dated August 3, 2005, it too, was denied. (R.66-75.) The plaintiff's seventh and most recent SSI application was protectively filed on September 19, 2005; in it he is alleging a disability onset date of August 4, 2005, one day following issuance of an adverse decision in his prior application. (R.14, 99-105,108-111; *see* also R.112-125, 135.)

In this current application the plaintiff alleges that he is disabled due to an obsessive-compulsive disorder, depression, irritable bowel syndrome, diverticulitis, sleep problems, and pains in his shoulder, elbows, hands and knees. (R.111,135.) Once again his application was denied initially, on reconsideration, and by written decision following a hearing before an administrative law judge ("ALJ"). (R.14-23,24-30, 79-80,141-142,354 *et seq*.) At the hearing, the plaintiff was present, testified and was represented by counsel. (R.354-381.) Robert Jackson, a vocational witness, was also present and testified. (R.14,31-34, 381 *et seq*.)

In his written decision dated February 23, 2007, the ALJ recognized the plaintiff's several decisionally significant health problems, including an irritable bowel syndrome and an obsessive compulsive/panic/depressive disorder. (R.16-18.) Based on his review of the plaintiff's limited

2

medical record, the ALJ next concluded that these conditions, either singularly or in combination, were not of listing-level severity.[1] (R.18-19.) After next determining the plaintiff's functional limitations, the ALJ concluded that he retained the ability to perform simple, repetitive, low-stress work requiring only occasional public contact at a light exertional level. [2] (R.19-21.) Based on the vocational testimony, the ALJ concluded that an individual with these limitations and the plaintiff's vocational profile [3] could work as a cashier, general production worker or cleaner and, therefore was not under a disability as defined by the Act between September 19, 2005 (the date of his application) and February 23, 2007 (the date of the ALJ's decision). (R.21-23.)

The plaintiff's subsequent request for Appeals Council review was denied, and the decision of the ALJ now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981. The plaintiff filed a timely appeal to this court, and the Commissioner's Answer was filed on September 11, 2009

---

[1] The adult impairments listed in 20 C.F.R. Part 404, Subpart P, Appx. 1, are descriptions of approximately 125 physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a [person] to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. *See* Social Security Ruling (SSR) 83-19." Sullivan v. Zebley 493 U.S. 521, 529-530 (1990).

[2] "*Light work*" is defined in 20 C.F.R. § 404.1567(b) to involve lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category generally requires a good deal of walking or standing, or when it involves sitting most of the time generally involves some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities. A job may also be considered light work if it requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday" with intermittent sitting. Social Security Ruling ("SSR") 83-10.

[3] At the time he filed his current SSI application the plaintiff was fifty-one years of age, which is defined as an individual closely approaching advanced aged. (R.22,99,105,108,141.) *See* 20 C.F.R. § 416.964. He attended school through the 10th grade, which is defined as a limited education. (R.22,115.) *See* 20 C.F.R. § 416.964. His past relevant work included jobs as chimney sweep, tune-up mechanic, and hotel maintenance person. (R.22.) *See* 20 C.F.R. § 416.965. He was determined to have transferrable skills and to lack the residual functional capacity to perform any of his past relevant work. (*Id.*) *See* 20 C.F.R. § 416.969a; Social Security Regulation 82-41.

3

along with a certified copy of the administrative record ("R.") containing the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision. By order of referral entered September 15, 2009, this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## II. Issues Presented on Appeal

In his appeal the plaintiff concedes that he possesses the physical ability to perform light work; however, he argues that the ALJ erroneously minimized his mental impairments on the basis of what the ALJ viewed to be a work history which was "not indicative of a individual motivated to work" (R.16), on the basis of the plaintiff's ability to live alone "largely unassisted" for many years (R.18), on what the plaintiff views to be the ALJ's failure to appreciate the functional significance of his mental health impairments, and on what he views to be the ALJ's over reliance on the functional assessments of the state agency reviewers. Noting *inter alia* the plaintiff's minimal mental health treatment during the period relevant to the ALJ's determination[4] and the results of consultive medical and psychiatric evaluations in 2006 which failed to demonstrate a mental impairment of disabling severity, the Commissioner argues that the ALJ's assessment of the plaintiff's mental impairments was based on substantial evidence and, therefore, should be affirmed. Each party has moved for

---

[4] *See* 20 C.F.R. §416.305 (the filing of an SSI application is a condition precedent to benefit eligibility) and § 416.335 (SSI benefits are not payable for any month prior to the filing of an application).

summary judgment; no written request was made for oral argument, [5] and the case is now before the undersigned for a report and recommended disposition.

## III.     Summary Recommendation

Based on a thorough review of the administrative record and for the reasons herein set forth, it is recommended that the plaintiff's motion for summary judgment be denied, the Commissioner's motion for summary judgment be granted, and an appropriate final judgment be entered affirming the Commissioner's decision denying benefits.

## IV.     Standard of Review

The court's review in this case is limited to determining whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the statutory conditions for entitlement to SSI. "Under the . . . Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard." *Mastro v. Apfel*, 270 F.3$^d$ 171, 176 (4th Cir. 2001) (*quoting Craig v. Chater*, 76 F.3$^d$ 585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro*, 270 F.3$^d$ at 176 (quoting *Laws v. Celebrezze*, 368 F.2$^d$ 640, 642 (4th Cir. 1966)). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh

---

[5] Paragraph 2 of the court's Standing Order No. 2005-2 requires that the plaintiff in a Social Security case must request oral argument in writing at the time his or her brief is filed.

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id.* (*quoting Craig v. Chater*, 76 F.3$^d$ at 589). The Commissioner's conclusions of law are, however, not subject to the same deferential standard and are subject to plenary review. *See Island Creek Coal Company v. Compton*, 211 F.3$^d$ 203, 208 (4th Cir. 2000); 42 U.S.C. § 405(g).

## V.     Facts and Analysis

The plaintiff's medical records from Salem VA Medical Center, dated between November 2002 and the end of January 2005, show that on four occasions he reported having problems with depression and anxiety. (R.179,197,199,202.) These records show that these complaints were managed pharmacologically; they suggest no need for any mental health evaluation or treatment, and they suggest no need for any hospitalization or other acute care. (*See* R.172-214.)

After having sought no medical or mental health care for one year, in January 2006 the plaintiff underwent a consultive medical assessment by Korin Hudson, MD. (R.217-224.) At that time the plaintiff complained of depression, a problem with compulsive hand washing and door closing, and a problem with his nerves. (R.217.) He denied any suicidal ideation, and he reported having not taken Prozac or a "nerve pill" for some time. (R.219.) Other than some limitation in the plaintiff's right shoulder range-of-motion, the results of Dr. Hudson's physical examination and the lumbar spine and shoulder radiographic studies were normal. (R.215-216,220-221,224,230.) Other than an observed affect and a range of thought consistent with depression, Dr. Hudson's neurologic exam was also essentially normal. (R.220-221,223.)

Two months later (fourteen months after having sought any type of medical care and six months after filing his SSI application) the plaintiff was seen by Dr. Ido Heletz, an internist at the University of Virginia Medical Center's Primary Care Clinic on March 10, 2006. (R.294-296.) Based on the plaintiff's complaints of anxiety and obsessive behaviors, Dr. Heletz prescribed Zoloft (an anti-depressant/anti-anxiety medication) and requested a psychiatric consultation. (R. 295-297,345.) In response to the plaintiff's complaints of persistent diarrhea and an irritable bowel condition, Dr. Heletz ordered a routine initial series of laboratory studies. (R.295-304.)

Over the next nine months the plaintiff was seen in the Primary Care Clinic on six additional occasions for followup testing and treatment related to his gastrointestinal problems. (R.294-279,280-283,284-287,280-287,306-309,310-312,313-328,329,330-335.) Only on the first two of these clinic visits (March 27 and April 27) was an reference made to an adjustment in the plaintiff's anti-depressant/anti-anxiety medication. (R.284,287.)

Pursuant to Dr. Herletz's referral, the plaintiff was seen for an outpatient psychiatric consultation on May 11, 2006. (R.233-236,340-343,344.) At the time of this intake evaluation, the plaintiff complained of obsessive-compulsive thoughts which he said "ha[d] been increasing in severity for the past five years," of anxiety "for as long as [he] could remember," and of "constant mood swings since 1994." (R.233,340.) Initial diagnoses of obsessive-compulsive, panic, and major depressive (recurrent, moderate) disorders were made; he was assessed by the examining psychiatric

resident to be then functioning at 40 on the GAF scale;[6] a new medication regime was initiated, and he was advised to be seen again in four weeks. (R.236,343,344.) He was subsequently seen at the clinic for medication management follow-ups on June 15, September 21, October 19 and January 12. (R.232, 336-339.) On each occasion the plaintiff reported that Zoloft helped decrease his symptomology, and on each occasion the examining physician reported no mental status abnormality, no perceptual disturbance, no abnormal thought process, and no other abnormality which would seriously impair the plaintiff's social or occupational functioning. (*Id.*)

On the basis of a July 11, 2006 consultive examination and review of an X-ray provided by the plaintiff, Dr. Chris Newell found the plaintiff to have some "mild" disc narrowing at L5 and S1, to have no range of motion limitations, by history to exhibit signs of social anxiety, depression and an obsessive-compulsive disorder, and to be functionally able to perform work activity at a light exertional level. (R.237-242.) Consistent with Dr. Newell's consultive assessment, a physical residual functional capacity assessment in January 2006 and similar mental assessments in August 2006 by state agency reviewers concluded that the plaintiff was capable of performing work at a light exertional level. (R,225-231,256-265.) Primarily on the basis of the May 15, 2006 University of Virginia Medical Center psychiatric consultation report, the reviewing state agency psychologist additionally opined that the plaintiff's mental health issues would "moderately" limit the plaintiff's

---

[6] The Global Assessment of functioning ("GAF") is a numeric scale which ranges from zero to 100 and is used by mental health clinicians and doctors to represent a judgment of an adult individual's overall level of "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Diagnostic and Statistical Manual of Mental Disorders Fourth Edition*, ("DSM-IV"), 32 (American Psychiatric Association 1994). A specific GAF score represents a clinician's judgment of an individual's overall level of functioning.] A GAF of 31-40 indicates some impairment in reality testing or communication or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM-IV at 32.

abilities to work closely with others without being distracted, to maintain attention and concentration for extended periods, to perform activities within a schedule, to interact appropriately with the public, and to travel to unfamiliar places. (R.256-258.)

After seeing the plaintiff on three occasions for medication management during the Fall of 2006, Dr. Harjet Sekhon completed a medical source statement in January 2007.[7] (R.347-349.) Therein, he described the plaintiff's mental health problems to include a panic disorder, agoraphobia, severe anxiety and obsessive-compulsive condition, and he opined that the plaintiff would have difficulty interacting with the public or dealing with workplace changes. In his opinion, he described the plaintiff as having a "good" ability to understand, remember and carry-out simple instructions, to respond appropriately to supervisors and to maintain himself appropriately; however, he viewed the plaintiff to have a "poor" ability to interact appropriately with the public, to maintain regular and punctual attendance and to respond appropriately to work-setting changes, and the plaintiff would have only a "fair" ability to perform other work-related mental activities.

## VI. Analysis

### A.

At its core the plaintiff's argument on appeal is that the ALJ erred by failing to give controlling weight to two treating source opinions relating directly to his disabling mental status. Such decisional weight, however, is appropriate only when the opinion is both well-supported by

---

[7] As part of his request for Appeals Council review, in December 2007 the plaintiff he submitted a similar form to the Appeals Council which had been completed by Dr. Pooja Sabharwel (R.351-354.) Given its apparent applicability to a period of time not decisionally relevant to the plaintiff's current application, it has been excluded from consideration herein.

9

medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. *Craig v. Chater*, 76 F.3$^d$ 585 (4th Cir. 1996); 20 C.F.R. § 416.927(d)(2). It is, therefore, the ALJ's obligation to evaluate all of the evidence in the case record and to determine the extent to which the treating source opinion is supported by the record. In the case now before the court, ALJ fulfilled this decisional obligation, and in doing so he appropriately discussed the judgments of both Dr. Jeffrey Overdyke and Dr. Harjet Sekhon. He appropriately discounted them, and he appropriately based his assessment on substantial evidence.

After reviewing the record in detail, the ALJ took note of the fact that Dr. Overdyke [8] had assessed the plaintiff to be functioning at only 40 on the GAF scale. Based, however, on the plaintiff's ability to live alone, his lack of any psychiatric hospitalization or therapy, [9] his mildly restricted in his daily activities, [10] the absence of any supporting longitudinal treatment record and the absence of significant support in the clinical examination notes, the ALJ concluded that the record did not support Dr. Overdyke's low GAF score. (R.17-18.)

---

[8] Dr. Overdyke was the psychiatric resident at University of Virginia Medical Center who saw the plaintiff in May 2006 and performed on referral the psychiatric consultation.

[9] As the ALJ observed in his decision, a GAF score of 40 "would require hospitalization and intense therapy." (R.18.)

[10] The plaintiff's testimony and written submissions show that he is functionally able to go to the store alone, visit family and friends weekly or more often, watch weekly NASCAR events with friends, maintain the inside of his home, cook for himself, read, and take care of his health and grooming needs. (R.154,156-257,368,370)

Although Dr. Sekhon's contact with the plaintiff was also extremely limited, [11] the ALJ similarly considered him to be a treating source; however, again based on the record, the ALJ concluded that Dr, Sekhon's judgments about the plaintiff's "poor" (essentially an absence of an ability to function usefully) in four areas of mental functioning and only a "fair" ability in fourteen others were neither supported by a significant longitudinal record of treatment nor consistent with an individual who had lived alone "largely unassisted" for many years. (R.16-18.) Both observations were decisionally appropriate and supported by the record. *See e.g., Cary v. SSA*, 2001 U.S. Dist. LEXIS 9813, *42 (EDVa, 2001 (ability to live alone virtually without limitation found to be inconsistent with the diagnosed mental condition); *Brock v. Astrue*, 2007 U.S. Dist. LEXIS 89602, *9 (EDNC, 2007) (lack of significant treatment found to be inconsistent with the alleged disability); *Tovar v. Astrue*, 2009 U.S. Dist. LEXIS 109187 , *25 (EDVa, 2009) (treating source opinion found not to be supported by a longitudinal treatment record).

**B.**

Secondarily, it is claimed that "bias" on the part of the ALJ adversely affected his ability to address properly the "true nature" of the plaintiff's mental health condition. This *bias*, the plaintiff argues, is evident from the ALJ's observation that the plaintiff's minimal earnings record since 1980 "was not indicative of an individual motivated to work" (R.16).

---

[11] As the ALJ noted on his decision, Dr. Sekhon saw the plaintiff through the UVAMC outpatient psychiatry clinic on only three occasions (September 21, 1996, October 19, 1996 and January 12, 2007) solely for medication management.(R.18,336-338.)

Essentially this contention advances the argument that *but for* an ongoing and debilitating mental health condition , which has lasted for approximately thirty years and which the ALJ failed to appreciate due to a negative bias, the plaintiff's earnings record would be significant. There is, however, simply nothing in the evidence to permit such an inference. Moreover, it is directly contradicted by the plaintiff's multiple prior applications in which he claimed various disability onset dates, but none earlier than January 1, 1994, and it is inconsistent with the *res judicata* effect of the adverse determinations on his multiple prior applications. (*E.g.*, R,38-39,66.) *See* 20 C.F.R. § 416.1457(c)(1).

In *Schweiker v. McClure,* 456 U.S. 188, 195 (1982), the Supreme Court made it clear that the constitutional requirement of due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities. A reviewing court, however, must start from the presumption that the ALJ was not biased. *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *United States v. Morgan*, 313 U.S. 409, 421 (1941). And the burden is, therefore, on the party making the claim of bias to demonstrate either some conflict of interest or other specific reason for disqualification. *See Gibson v. Berryhill,* 411 U.S. 564, 578-579 (1973); *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972).

In the case now before the court, the plaintiff's claim of bias is simply not supported by the evidence. Viewed in a light most favorable to the plaintiff, the statement suggests at most some disdain for the plaintiff's apparent lack of motivation over approximately thirty years. Such impressions or feelings are not evidence either of bias or partiality. In evaluating plaintiff's claim of bias, this court must begin with the "presumption that policymakers with decision making power

exercise their power with honesty and integrity." *Navistar International Transportation Corp. v. United States Environmental Protection Agency,* 941 F.2d 1339, 1360 (6th Cir. 1991).

The burden of overcoming this "presumption of impartiality rests on the party making the assertion [of bias], and the presumption can be overcome only with convincing evidence that a risk of actual bias or prejudgment is present." *Id.* (citing *Schweiker v. McClure,* 456 U.S. 188, 196 (1982), and *Withrow v. Larkin,* 421 U.S. 35, 47 (1975)). In other words, "any alleged prejudice on the part of the decision maker must be evident from the record and cannot be based on speculation or inference." *Id*. Given the record before the ALJ in the case now before the court, it was only a healthy measure of skepticism, not bias, which is evident from the ALJ's contested observation.

## C.

As a third contention on appeal the plaintiff argues that the ALJ "over[ly] relied" on functional assessments made by non-treating, non-examining state agency reviewers. Although the agency's regulations provide for a progressively more rigorous test for weighing the opinions of physicians and psychologists, including state agency medical and psychological consultants, as the tie between the source of the opinion and the individual become weaker, in appropriate circumstances, opinions from state agency program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. 20. C.F.R. § 416.927(f).

For multiple reasons evident in the record, the ALJ significantly discounted the treating source judgments Drs. Overdyke and Sekhon about the state of the plaintiff's mental health. Neither one was

13

based on a significant longitudinal record of treatment. (R.21.) Neither one was well-supported by any clinical or diagnostic studies. (*Id.*) Neither one was consistent with three prior factually relevant ALJ decisions, including the most recent of which that was rendered on August 3, 2005. (*Id.*) *See Albright v. Commissioner, SSA*, 174 F.3$^d$ 473 (4th Cir. 1999). [12] Neither one was supported by any referral for specialized mental health care. (*Id.*) Neither one was consistent with the absence of any significant daily living accommodation occasioned by the plaintiff's mental health issues. And neither one was consistent with the findings and opinions of the consultive physicians and state agency reviewers. (*Id.*)

In contrast, the ALJ found the state agency functional assessments to be consistent with plaintiff's outpatient medical records during the relevant period, and he incorporated them in his functional capacity finding. (R.17,20-23.) Among other things, in making this finding the ALJ also took note of Dr. Newell's consultive assessment that the plaintiff was capable of a range of light work and the plaintiff's demonstrated ability to complete Dr. Hudson's medical questionnaire and to sit through the doctor's consultive examination without apparent difficulty, despite have been taking no medication for a considerable time. (R.16-17,217-221,237-242.)

## VII.   Proposed Findings of Fact

---

[12] In *Albright*, the Fourth Circuit held that the agency treats an individual's "second or successive application for disability benefits as a claim apart . . . at least to the extent that the most recent application alleges a previously unadjudicated period of disability." In other words, "[a]t each decision-making level the agency recognizes the traditional rule that, absent an identity of claims, principles of claim preclusion (historically referred to as *res judicata*) do not apply." *Albright*. 174 F.3$^d$ at 476. *Cf. Rucker v. Chater*, 92 F.3$^d$ 492, 495 (7th Cir. 1996) (a four-year interval between applications found to make differing conclusions concerning the claimant's residual functional capacity "entirely plausible'").

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1. All facets of the Commissioner's final decision are supported by substantial evidence;

2. The record demonstrated no improper bias on the part of the ALJ;

3. Substantial evidence supports the finding that the plaintiff had no condition, either singularly or in combination, that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1;

4. The ALJ did not err in his review of the plaintiff's physical impairments and associated functional limitations;

5. The ALJ did not err in his review of the plaintiff's psychiatric impairments and associated functional limitations;

6. Substantial evidence supports the finding that during the period relevant to the plaintiff's application (from the date of its filing through the date of the ALJ's decision) the plaintiff retained the functional ability, despite his mental impairments, to perform the requirements of representative occupations such as a cleaner and a general production worker as described by the vocational witnesses at a light exertional level with the limitations outlined by the ALJ in his decision;

7. The medical information and opinions of Dr. Overdyke were appropriately considered;

8. The medical information and opinions of Dr. Sekhon were appropriately considered;

9. The plaintiff has not met his burden of proving his disability; and

10. The final decision of the Commissioner should be affirmed.

**VIII.   Recommended Disposition**

For the foregoing reasons, it is RECOMMENDED that an order be entered AFFIRMING the final decision of the Commissioner, GRANTING SUMMARY JUDGMENT to the defendant, DENYING plaintiff's claim, and DISMISSING this case from the docket of the court.

The clerk is directed to transmit the record in this case immediately to the presiding district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

## IX. Notice to the Parties

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties**. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

DATED: 12th day of April 2010.

/s/ *James G. Welsh*
United States Magistrate Judge